**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSHUA CALEB BOHMKER; LARRY COON; WALTER R. EVENS; GALICE MINING DISTRICT; JASON GILL; MICHAEL HUNTER; MICHAEL P. LOVETT; JOEL GROTHE; MILLENNIUM DIGGERS; WILLAMETTE VALLEY MINERS; DON VAN ORMAN; J.O.G. MINING LLC, *Plaintiffs-Appellants*, | No. 16-35262 D.C. No. 1:15-cv-01975-CL OPINION |

v.

STATE OF OREGON; ELLEN ROSENBLUM, in her official capacity as the Attorney General of the State of Oregon; MARY ABRAMS, in her official capacity as the Director of the Oregon Department of State Lands,
          *Defendants-Appellees*,

ROGUE RIVERKEEPER; PACIFIC COAST FEDERATION OF FISHERMAN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; OREGON COAST ALLIANCE; CASCADIA WILDLANDS; NATIVE FISH

SOCIETY; CENTER FOR BIOLOGICAL
DIVERSITY,
  *Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the District of Oregon
Mark D. Clarke, Magistrate Judge, Presiding

Argued and Submitted March 8, 2018
Portland, Oregon

Filed September 12, 2018

Before:  Raymond C. Fisher, N. Randy Smith
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge N.R. Smith

# SUMMARY[*]

## Mining Law / Preemption

Affirming the district court's summary judgment in favor of defendants, the panel held that mining restrictions set forth in Oregon Senate Bill 3 are not preempted by federal law.

To protect threatened fish populations, Senate Bill 3 prohibits the use of motorized mining equipment in rivers and streams containing essential salmon habitat. The restrictions apply throughout the state, including on rivers and streams located on federal lands. Plaintiffs have mining claims on federal land in Oregon.

Assuming without deciding that federal law preempts the extension of state land use plans onto unpatented mining claims on federal land, the panel held that Senate Bill 3 is not preempted because it constitutes an environmental regulation, not a state land use planning law. In addition, Senate Bill 3 does not stand as an obstacle to the accomplishment of the full purposes and objectives of Congress. The panel concluded that reasonable state environmental restrictions such as those found in Senate Bill 3 are consistent with, rather than at odds with, the purposes of federal mining and land use laws. The panel held that Senate Bill 3 therefore is neither field preempted nor conflict preempted.

Dissenting, Judge N.R. Smith wrote that the National Forest Management Act and the Federal Land Policy and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Management Act occupy the field of land use planning regulation on federal lands. He wrote that because the permanent ban on motorized mining in Oregon Senate Bill 3 does not identify the environmental standard to be achieved but instead restricts a particular use of federal land, it must be deemed a land use regulation preempted by federal law.

## COUNSEL

James L. Buchal (argued), Murphy & Buchal LLP, Portland, Oregon, for Plaintiffs-Appellants.

Carson Leonard Whitehead (argued), Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendants-Appellees.

Peter M.K. Frost (argued), Western Environmental Law Center, Eugene, Oregon; Roger Flynn, Western Mining Action Project, Lyons Colorado; for Intervenor-Defendants-Appellees.

Julio N. Colomba, Jonathan Wood, and Damien M. Schiff, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Pacific Legal Foundation and Western Mining Alliance.

Sean Patrick Smith, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae American Exploration & Mining Association.

Lane N. McFadden, Attorney; John C. Cruden, Assistant Attorney General; Environment & Natural Resources

Division, United States Department of Justice, Washington, D.C.; Kendra Nitta and Roy W. Fuller, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; John Eichhorst, Deputy Regional Attorney, Office of the General Counsel, Pacific Region, United States Department of Agriculture, San Francisco, California; for Amicus Curiae United States of America.

Marc N. Melnick, Deputy Attorney General; Gavin G. McCabe, Supervising Deputy Attorney General; Joshua A. Klein, Deputy Solicitor General; Robert W. Byrne, Senior Assistant Attorney General; Office of the Attorney General, Oakland, California; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; for Amici Curiae States of California and Washington.

Nicholas Stevens Bryner and Sean B. Hecht, UCLA School of Law, Los Angeles, California; Eric Biber, UC Berkeley School of Law, Berkeley, California; for Amici Curiae Western Public Land Law Professors.

## OPINION

FISHER, Circuit Judge:

To protect threatened fish populations, Oregon prohibits the use of motorized mining equipment in rivers and streams containing essential salmon habitat. The restrictions, adopted into law as Senate Bill 3, apply throughout the state, including on rivers and streams located on federal lands. The district court concluded the restrictions are not preempted by federal law, and we agree. Assuming without deciding that federal law preempts the extension of state land use plans onto unpatented mining claims on federal lands, Senate Bill 3 is not preempted, because it constitutes an environmental regulation, not a state land use planning law. Senate Bill 3, moreover, does not stand as an obstacle to the accomplishment of the full purposes and objectives of Congress. As the United States points out in its amicus brief opposing the plaintiffs' preemption challenge, reasonable environmental restrictions such as those found in Senate Bill 3 are consistent with, rather than at odds with, the purposes of federal mining and land use laws. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 588–89 (1987) (rejecting the proposition that federal law preempts the application of reasonable state environmental regulations to the operation of unpatented mining claims on federal lands).

## BACKGROUND

The Oregon legislature adopted Senate Bill 838 in 2013. The Bill's legislative findings recognize both the state's rich tradition of small scale prospecting and mining and its

environmental interest in protecting water quality and fish
habitat.  The findings state:

> (1) Prospecting, small scale mining and
> recreational mining are part of the unique
> heritage of the State of Oregon.
>
> (2) Prospecting, small scale mining and
> recreational mining provide economic
> benefits to the State of Oregon and local
> communities and support tourism, small
> businesses and recreational opportunities, all
> of which are economic drivers in Oregon's
> rural communities.
>
> (3) Exploration of potential mine sites is
> necessary to discover the minerals that
> underlie the surface and inherently involves
> natural resource disturbance.
>
> (4) Mining that uses motorized equipment in
> the beds and banks of the rivers of Oregon can
> pose significant risks to Oregon's natural
> resources, including fish and other wildlife,
> riparian areas, water quality, the investments
> of this state in habitat enhancement and areas
> of cultural significance to Indian tribes.
>
> (5) Between 2007 and 2013, mining that uses
> motorized equipment in the beds and banks of
> the rivers of Oregon increased significantly,
> raising concerns about the cumulative
> environmental impacts.

(6) The regulatory system related to mining that uses motorized equipment in the beds and banks of the rivers of Oregon should be efficient and structured to best protect environmental values.

2013 Or. Laws ch. 783, § 1.

Consistent with these findings, the law imposed a five-year moratorium, beginning in 2016, on motorized mining techniques in areas designated as essential fish habit:

A moratorium is imposed until January 2, 2021, on mining that uses any form of motorized equipment for the purpose of extracting gold, silver or any other precious metal from placer deposits of the beds or banks of the waters of this state, as defined in ORS 196.800, or from other placer deposits, that results in the removal or disturbance of streamside vegetation in a manner that may impact water quality. The moratorium applies up to the line of ordinary high water, as defined in ORS 274.005, and 100 yards upland perpendicular to the line of ordinary high water that is located above the lowest extent of the spawning habitat in any river and tributary thereof in this state containing essential indigenous anadromous salmonid habitat, as defined in ORS 196.810, or naturally reproducing populations of bull trout, except in areas that do not support populations of anadromous salmonids or natural reproducing populations of bull trout

due to a naturally occurring or lawfully placed
physical barrier to fish passage.

*Id.* § 2(1). "'Essential indigenous anadromous salmonid habitat' means the habitat that is necessary to prevent the depletion of indigenous anadromous salmonid species during their life history stages of spawning and rearing." Or. Rev. Stat. § 196.810(1)(g)(B).

The plaintiffs filed this action in October 2015, three months before the moratorium was to take effect. The 12 plaintiffs have mining claims on federal lands in Oregon and use a form of motorized mining known as suction dredge mining to search for and extract gold deposits from rivers and streams.[1] The plaintiffs alleged that many of their mining claims were located in "essential indigenous anadromous salmonid habitat" and that the moratorium on motorized mining imposed by Senate Bill 838 would prevent them from mining these claims. They argued that Senate Bill 838 was preempted by federal law because it "interfere[d] with the federal purpose of fostering and encouraging mineral development on federal property, and st[ood] as an obstacle

---

[1] Suction dredging is

a technique used by miners to remove matter from the bottom of waterways, extract minerals, and return the residue to the water. A high-powered suction hose vacuums loose material from the bottom of a streambed. Heavier matter, including gold, is separated at the surface by passage through a floating sluice box, and the excess water, sand, and gravel is discharged back into the waterway.

*People v. Rinehart*, 377 P.3d 818, 820 (Cal. 2016).

to the accomplishment and execution of the purposes and objectives of Congress." Compl. ¶ 49. The plaintiffs sought an injunction restraining the state from enforcing Senate Bill 838 and a declaration that the Bill was preempted by federal law. Compl. 14.

The district court granted the state's motion for summary judgment, ruling that, because Senate Bill 838 was a reasonable environmental regulation, it was not preempted. After the court entered judgment in favor of the state, the plaintiffs timely appealed.

After briefing in this court was completed, the Oregon legislature adopted Senate Bill 3. Senate Bill 3 repealed the moratorium imposed by Senate Bill 838 and imposed a permanent restriction on the use of motorized mining equipment in waters designated as essential indigenous anadromous salmonid habitat. It states:

> In order to protect indigenous anadromous salmonids and habitat essential to the recovery and conservation of Pacific lamprey, motorized in-stream placer mining may not be permitted to occur up to the line of ordinary high water in any river in this state containing essential indigenous anadromous salmonid habitat, from the lowest extent of essential indigenous anadromous salmonid habitat to the highest extent of essential indigenous anadromous salmonid habitat.

2017 Or. Laws ch. 300, § 4(2). Although the restrictions imposed by Senate Bill 3 differ in some respects from those in Senate Bill 838, both laws prohibit motorized mining in

rivers and streams designated as essential salmon habitat.[2] The parties therefore agree that the adoption of Senate Bill 3 does not moot this appeal. *See Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 & n.3 (1993) (holding that the repeal of a challenged ordinance and its replacement with a different ordinance did not render the plaintiff's claims moot where the ordinance had not been "sufficiently altered so as to present a substantially different controversy from the one the District Court originally decided" and the two ordinances "disadvantage[d] [the plaintiff] in the same fundamental way"). The parties also agree that we should treat this appeal as a challenge to Senate Bill 3. We now proceed to do so.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. Because at least some of the plaintiffs have standing to pursue this appeal, we need not address the standing of additional plaintiffs. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.").[3] Our review is de novo. *See*

---

[2] Unlike Senate Bill 838, for example, Senate Bill 3 does not prohibit motorized mining in bull trout habitat. In addition, although the moratorium imposed by Senate Bill 838 extended to mining in areas up to 100 yards from waterways, the restrictions on motorized mining in Senate Bill 3 apply only within rivers and streams themselves.

[3] We therefore need not address whether plaintiffs Galice Mining District, Millennium Diggers and Willamette Valley Miners have established standing, either in their own right or on behalf of their members. *See Associated Gen. Contractors of Am., San Diego Chapter,*

*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 777 (9th Cir. 2014) (en banc) (grant or denial of summary judgment); *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003) (federal preemption).

## DISCUSSION

## A.  Background Legal Principles

### 1.  *Federal Laws Governing Mining on Federal Lands*

We begin with an overview of the federal laws respecting mining on federal lands.  We consider only those laws the parties have identified as relevant to the preemption issues presented in this appeal.

"Historically, the Federal mining law has been designed to encourage individual prospecting, exploration, and development of the public domain."  H.R. Rep. No. 84-730 (1955), *as reprinted in* 1955 U.S.C.C.A.N. 2474, 2476. "Under these laws, prospectors may go out on the public domain not otherwise withdrawn, locate a mining claim, search out its mineral wealth and, if discovery of mineral is made, can then obtain a patent."  *Id.*

The Mining Act of 1872, 17 Stat. 91, for example, provides that:

---

*Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (explaining that, to establish associational standing, a plaintiff must provide specific allegations showing that at least one identified member has suffered or would suffer harm).

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be *free and open to exploration and purchase*, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, *under regulations prescribed by law*, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

30 U.S.C. § 22 (emphasis added). Under this Act, prospectors could acquire unpatented mining claims by discovering valuable mineral resources on federal lands, marking the location of their claims and recording their claims in accordance with state law:

Rights to mineral lands, owned by the United States, are initiated by prospecting, that is, searching for minerals thereon, and, upon the discovery of mineral, by locating the lands upon which such discovery has been made, or lands which the prospector believes to be valuable for minerals. A location is made by staking the corners of the claim, posting a notice of location thereon, and complying with the State laws regarding the recording of the location in the county recorder's office, discovery work, etc.

H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. at 2477.

Once the prospector staked out a claim, "the locator, without further requirement under Federal law, as of that moment, acquire[d] the immediate right to exclusive possession, control, and use of the land within the corners of his location stakes." *Id.* at 2478. As the Mining Act explains:

> The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, *shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations*, and of all veins, lodes, and ledges throughout their entire depth . . . .

30 U.S.C. § 26 (emphasis added). To protect this right to exclusive possession, a locator annually must perform $100 worth of labor or carry out improvements worth $100 in value. *See id.* § 28.

The locator of an unpatented mining claim either "may remove the minerals from the land without first proceeding to patent," H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. at 2478, or may obtain a patent by, inter alia, filing an application under oath, showing that $500 worth of labor has been expended or improvements made with respect to the claim and making a payment to the proper officer of $5 per acre, *see* 30 U.S.C. § 29. Although "[a]n 'unpatented' claim is a

possessory interest in a particular area solely for the purpose of mining," the owner of a patented claim "gets a fee simple interest from the United States." *Clouser v. Espy*, 42 F.3d 1522, 1525 n.2 (9th Cir. 1994). The mining claims at issue in this case are unpatented.

By 1955, Congress had become increasingly aware of "abuses under the general mining laws by those persons who locate[d] mining claims on public lands for purposes other than that of legitimate mining activity." H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. at 2478. Sham claims, for example, "could be used for selling timber from national forests, or obtaining free residential or agricultural land." *United States v. Shumway*, 199 F.3d 1093, 1101 (9th Cir. 1999) (citing *United States v. Curtis Nev. Mines, Inc.*, 611 F.2d 1277, 1282 (9th Cir. 1980)). Congress was also concerned that according the holders of unpatented mining claims exclusive surface rights prevented the "efficient management and administration of the surface resources of the public lands." H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. at 2474. Mining locations made under existing law, for example,

> frequently block[ed] access: to water needed in grazing use of the national forests or other public lands; to valuable recreational areas; to agents of the Federal Government desiring to reach adjacent lands for purposes of managing wild-game habitat or improving fishing streams so as to thwart the public harvest and proper management of fish and game resources on the public lands generally, both on the located lands and on adjacent lands.

*Id.* at 2478–79.

To address these concerns, Congress adopted the Surface Resources and Multiple Use Act of 1955, Pub. L. No. 84-167, 69 Stat. 367 (1955).  This law prohibits the location of any mining claim for purposes other than mining, *see* 30 U.S.C. § 612(a), and reserves in the United States – rather than granting to locators – the right to manage the surface resources of unpatented mining claims located after 1955, subject to the important proviso that "any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto," *id.* § 612(b).   The law states:

> Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States).  Any such mining claim shall also be subject, prior to issuance of patent therefor, to the right of the United States, its permittees, and licensees, to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land:  Provided, however, *That any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably*

*incident thereto*:  Provided further, That if at any time the locator requires more timber for his mining operations than is available to him from the claim after disposition of timber therefrom by the United States, subsequent to the location of the claim, he shall be entitled, free of charge, to be supplied with timber for such requirements from the nearest timber administered by the disposing agency which is ready for harvesting under the rules and regulations of that agency and which is substantially equivalent in kind and quantity to the timber estimated by the disposing agency to have been disposed of from the claim:  Provided further, *That nothing in this subchapter and sections 601 and 603 of this title shall be construed as affecting or intended to affect or in any way interfere with or modify the laws of the States which lie wholly or in part westward of the ninety-eighth meridian relating to the ownership, control, appropriation, use, and distribution of ground or surface waters within any unpatented mining claim.*

*Id.* § 612(b) (emphasis added).  The legislation sought to "encourage mining activity on . . . public lands compatible with utilization, management, and conservation of surface resources such as water, soil, grass, timber, parks, monuments, recreation areas, fish, wildlife, and waterfowl." H.R. Rep. No. 84-730, 1955 U.S.C.C.A.N. at 2475.

In 1970, Congress adopted the Mining and Minerals Policy Act of 1970, Pub. L. No. 91-631, 84 Stat. 1876 (1970). This law declares it the policy of the United States to foster the development of an "economically sound and stable domestic mining" industry, but subject to "environmental needs," 30 U.S.C. § 21a, making clear that "Congress did not, and does not, intend mining to be pursued at all costs," *Rinehart*, 377 P.3d at 825. It states:

> The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals *to help assure satisfaction* of industrial, security and *environmental needs*, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) *the study and development of methods* for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, *so as to lessen any adverse impact of mineral extraction and processing upon the physical environment* that may result from mining or mineral activities.

30 U.S.C. § 21a (emphasis added).[4]

### 2. *Federal Laws Governing National Forests*

The Organic Administration Act, 30 Stat. 11, 35–36 (1897), provides that nothing in 16 U.S.C. §§ 473–82 and 551 "shall . . . prohibit any person from entering upon . . . national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof." 16 U.S.C. § 478. It also provides, however, that "[s]uch persons must comply with the rules and regulations covering such national forests." *Id.* The Organic Act, moreover, requires the Secretary of Agriculture to "make provisions for the protection against destruction by fire and depredations upon the public forests and national forests," and it authorizes the Secretary to "make such rules and regulations" regarding "occupancy and use" as may be necessary "to preserve the forests thereon from destruction." *Id.* § 551.

Under this rulemaking authority, the U.S. Forest Service has promulgated rules regulating mining on national forest lands. These regulations require mining operators to comply with applicable federal and state air quality standards, water quality standards and standards for the disposal and treatment of solid wastes. *See* 36 C.F.R. § 228.8(a)–(c).

---

[4] In 1977, Congress adopted the Surface Mining Control and Reclamation Act of 1977, Pub. L. No. 95-87, 91 Stat. 445 (1977). In relevant part, this law allows the governor of a state to ask the Secretary of the Interior to designate lands as unsuitable for mining on the ground that "mining operations would have an adverse impact on lands used primarily for residential or related purposes." 30 U.S.C. § 1281(a)–(b). The plaintiffs do not suggest this provision presented an option for Oregon here.

The Multiple-Use and Sustained-Yield Act of 1960, Pub. L. No. 86-517, 74 Stat. 215 (1960), directs the Secretary of Agriculture "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield." 16 U.S.C. § 529. After declaring it "the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," the Act states that "[n]othing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests." *Id.* § 528. It further states that "[n]othing herein shall be construed so as to affect the use or administration of the mineral resources of national forest lands or to affect the use or administration of Federal lands not within national forests." *Id.*

The National Forest Management Act of 1976 (NFMA), Pub. L. No. 94-588, 90 Stat. 2949 (1976), requires the Secretary of Agriculture to "develop . . . land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies." 16 U.S.C. § 1604(a). In developing such plans, the Secretary shall assure that they "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960." *Id.* § 1604(e)(1).

In addition, federal lands, including those falling outside national forests, are governed by the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, 90 Stat. 2743 (1976). FLPMA requires the Secretary of the Interior to develop land use plans for public lands, *see* 43 U.S.C. § 1712(a), and to "manage the public lands under

principles of multiple use and sustained yield," *id.* § 1732(a). FLPMA directs that, "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b). This "unnecessary or undue degradation" mandate applies not only to land use generally but also to the regulation of mining operations in particular. *See id.* (providing that nothing in FLPMA, *other than* the provision establishing the "unnecessary or undue degradation" standard, "shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress"). FLPMA further provides that "nothing in this Act shall be construed as . . . enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife." *Id.*

Under FLPMA, the Bureau of Land Management (BLM) has issued regulations requiring mining operators to "comply with applicable Federal and state" air quality standards, water quality standards and standards for the disposal and treatment of solid wastes. 43 C.F.R. § 3809.420(b)(4)–(6). Another BLM regulation requires mining operators to comply with state environmental regulations that do not conflict with federal law: "If State laws or regulations conflict with this subpart regarding operations on public lands, you must follow the requirements of this subpart. However, there is no conflict if the State law or regulation requires a higher standard of protection for public lands than this subpart." *Id.* § 3809.3.

### 3. *Overview of Applicable Federal Laws*

The foregoing laws, in the aggregate, reflect Congress' intent to foster a productive mining industry but also its intent to protect the environment.  These laws declare many federal lands "free and open" to exploration, 30 U.S.C. § 22, preclude the United States from using the surface area of certain mining claims in a manner that would "endanger or materially interfere" with the underlying mining claims, *id.* § 612(b), declare it to be the policy of the United States to foster "the development of economically sound and stable domestic mining . . . industries," *id.* § 21a, and preserve a role for prospecting and mining in national forests, *see* 16 U.S.C. §§ 478, 528.  At the same time, these laws require miners to comply with state laws, *see* 30 U.S.C. § 22, including state environmental laws, *see, e.g.*, 36 C.F.R. § 228.8; 43 C.F.R. §§ 3809.3, 3809.420(b), declare it the policy of the United States to assure that mining satisfies the nation's "environmental needs," 30 U.S.C. § 21a, require the Secretary of Agriculture to protect national forests from "depredations" and "destruction," 16 U.S.C. § 551, require the Secretary of the Interior to protect public lands from "unnecessary or undue degradation," 43 U.S.C. § 1732(b), and recognize the states' broad authority to manage fish and wildlife, *see* 16 U.S.C. § 528; 43 U.S.C. § 1732(b).  In light of these provisions, it is common ground among the parties that the holders of unpatented mining claims do not have an "unfettered" right to explore and mine federal lands, unencumbered by federal and state environmental regulation. Nor does anyone argue that states' environmental regulatory authority in this area is unbounded.  Congress plainly intended to draw a line between these two extremes.

### 4.  *The* Granite Rock *Decision*

The Supreme Court addressed this line drawing in *California Coastal Commission v. Granite Rock Co.*, 480 U.S. 572 (1987).  After the Granite Rock Company secured unpatented mining claims on national forest land and the Forest Service approved the company's plan of operations for the removal of limestone, the California Coastal Commission instructed the company to apply for a permit under the California Coastal Act, which prohibits any development, including mining, in the state's coastal zone without a permit.  *See id.* at 575–76.  The company sued to enjoin the enforcement of the permit requirement, arguing federal preemption.  *See id.* at 577.

The Supreme Court rejected the company's claims. The Court began by observing that

> [S]tate law can be pre-empted in either of two general ways.  If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted.  If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Id.* at 581 (alteration in original) (citations omitted) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)).

The Court next summarily rejected the proposition that the Mining Act of 1872 demonstrates an intent to preempt any state environmental regulation on federal lands. As the Court explained, "Granite Rock concedes that the Mining Act of 1872, as originally passed, expressed no legislative intent on the as yet rarely contemplated subject of environmental regulation." *Id.* at 582.

Next, the Court rejected Granite Rock's argument that "the Federal Government's environmental regulation of unpatented mining claims in national forests demonstrates an intent to pre-empt any state regulation." *Id.* at 581–82. The Court concluded that

> the Forest Service regulations that Granite Rock alleges pre-empt any state permit requirement not only are devoid of any expression of intent to pre-empt state law, but rather appear to assume that those submitting plans of operations will comply with state laws. . . . It is impossible to divine from these regulations, which *expressly contemplate coincident compliance with state law as well as with federal law*, an intention to pre-empt all state regulation of unpatented mining claims in national forests.

*Id.* at 583–84 (emphasis added) (citing 36 C.F.R. §§ 228.5(b), 228.8(a)–(c), (h)). The Court added that "[n]either Granite Rock nor the United States contends that these Forest Service regulations are inconsistent with their authorizing statutes." *Id.* at 584.

The Court then turned to Granite Rock's argument that "federal land management statutes demonstrate a legislative intent to limit States to a purely advisory role in federal land management decisions, and that the Coastal Commission permit requirement is therefore pre-empted as an impermissible state land use regulation." *Id.* The Court assumed arguendo that "the combination of the NFMA and the FLPMA pre-empts the extension of state land use plans onto unpatented mining claims in national forest lands." *Id.* at 585. But even under this assumption, the Court held that only "state land use plans" would be preempted, not state "environmental regulation." *Id.* at 585–86.

The Court did not define the terms "land use planning" and "environmental regulation," but it offered some guidance as to the distinction between the two:

> The line between environmental regulation and land use planning will not always be bright; for example, one may hypothesize a state environmental regulation so severe that a particular land use would become commercially impracticable. However, the core activity described by each phrase is undoubtedly different. Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits. Congress has

> indicated its understanding of land use planning and environmental regulation as distinct activities.

*Id.* at 587.

The Court suggested that a state's decision to "prohibit" or "ban" mining would constitute land use planning, and hence would be preempted. *See id.* at 586–87. It further intimated that a law would be preempted if, although couched as environmental regulation, its "true purpose" was to prohibit mining. *Id.* at 588. At bottom, however, the Court made clear that "reasonable state environmental regulation is not pre-empted." *Id.* at 589; *see also id.* at 593.

## B.  The Plaintiffs' Arguments

The plaintiffs argue: (1) Senate Bill 3 is field preempted because it constitutes state "land use planning" under *Granite Rock*; (2) Senate Bill 3 is conflict preempted because it is "prohibitory, not regulatory, in its fundamental character," *S.D. Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1011 (8th Cir. 1998); (3) Senate Bill 3 is conflict preempted because it does not constitute "reasonable state environmental regulation"; and (4) genuine issues of material fact preclude the entry of summary judgment in favor of the state. We address these arguments in turn.

### 1.  *Field Preemption: The Plaintiffs' Argument That Senate Bill 3 Constitutes State Land Use Planning*

*Granite Rock* assumed without deciding that "the combination of the NFMA and the FLPMA pre-empts the extension of state land use plans onto unpatented mining

claims in national forest lands." 480 U.S. at 585. We make the same assumption here.[5] But like the Supreme Court in *Granite Rock*, we reject the plaintiffs' preemption claim. Senate Bill 3 is an environmental regulation rather than a land use planning law. It does not choose or mandate land uses, has an express environmental purpose of protecting sensitive fish habitat, is not part of Oregon's land use system and is carefully and reasonably tailored to achieve its environmental purpose without unduly interfering with mining operations. Senate Bill 3 is precisely the kind of reasonable state environmental regulation that the Supreme Court recognized in *Granite Rock* properly supplements rather than displaces federal land use planning decisions. To be sure, by restricting motorized suction dredge mining in rivers and streams designated as essential habitat for threatened salmonids, Senate Bill 3 will adversely impact the ability of some miners to extract gold deposits from their mining claims. But these impacts are the unavoidable consequences of a federal scheme that seeks to foster both the development of valuable mineral resources and proper stewardship and protection of the nation's natural resources.

The plaintiffs do not argue that Senate Bill 3 becomes a land use law under *Granite Rock* simply because it may render some of their mining claims commercially

---

[5] We view the application of this assumption, as do the parties, as a question of field preemption rather than conflict preemption. But, even if we were to view it as a question of conflict preemption, we would find no conflict, because Senate Bill 3 is not a land use law.

impracticable.**[6]**   We agree with the United States that the preemption inquiry does not turn on profitability:

> To be sure, there will be miners (including some Plaintiffs) who cannot profitably extract certain minerals from their mining claims without the use of motorized equipment in the water.  But . . . specific limitations on specific mining methods or activities have long been part of the business of mining.  A State law cannot be deemed preempted solely on the basis that the cost of mining in compliance with the law makes a particular miner unable to profit from a particular mining claim.

Brief of the United States as Amicus Curiae 26–27.  Because "[v]irtually all forms of . . . regulation of mining claims – for instance, limiting the permissible methods of mining and prospecting in order to reduce incidental environmental damage – will result in increased operating costs," *Clouser*,

---

**[6]** The dissent contends the plaintiffs have made a commercial impracticability argument.  Dissent 68.  We have, however, carefully reviewed their opening and reply briefs on appeal, and no such argument exists there.  The plaintiffs argue Senate Bill 3 is preempted because it prohibits mining, not because it renders their claims unprofitable.  As the plaintiffs make clear, "[t]his appeal is not about profitability, but about prohibition."  Reply Br. 41.  The plaintiffs have therefore waived the argument.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually argued in appellant's opening brief."); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived."); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant . . . .").  This rule applies with particular force where, as here, the plaintiffs have expressly disclaimed the argument in question.

42 F.3d at 1530, virtually every environmental regulation will render at least some mining claims commercially impracticable, and virtually every environmental regulation would therefore be preempted under a commercial impracticability test, a proposition that is impossible to reconcile with *Granite Rock*'s central holding that "reasonable state environmental regulation is *not* preempted," *Granite Rock*, 480 U.S. at 589 (emphasis added). A commercial impracticability theory, moreover, would require the preemption analysis to turn on each miner's individual financial circumstances: the law would be preempted as to some miners but not as to others. Indeed, a commercial impracticability test would give the greatest protection to the least profitable mining operations, and it would handcuff regulators from restricting even the most environmentally destructive mining methods. So long as a particularly destructive method of mining – such as blasting – presented the only commercially practicable means of extracting minerals, regulators would be barred from restricting that practice. We do not read *Granite Rock* as supporting that result. As the California Supreme Court has explained, federal law does not show that Congress "viewed mining as the highest and best use of federal land wherever minerals were found." *Rinehart*, 377 P.3d at 830.

Rather, the plaintiffs contend that Senate Bill 3 constitutes a state land use planning law because it "prohibits" a particular "use" of the land (motorized mining methods) in particular "zones" (rivers and streams designated as essential salmonid habitat). The plaintiffs base this argument on language in *Granite Rock* explaining that

> the core activity described by [environmental regulation and land use planning] is

> undoubtedly different. Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits.

480 U.S. at 587. The plaintiffs argue Senate Bill 3 is state land use planning under this language because (1) it chooses particular uses of the land and (2) does not prescribe limits on environmental damage by, for example, promulgating a pollution standard.

We disagree. First, Senate Bill 3 does not "choose[]" or "mandate particular uses of the land." *Id.* It simply restricts one method of mining.[7]

---

[7] Like the permit requirement in *Granite Rock*, moreover, Senate Bill 3 is not a "ban" or "prohibition" on mining. *See* 480 U.S. at 586–87. Senate Bill 3 does not prohibit the plaintiffs' mining operations. Many of the plaintiffs engage in upland mining, mine in rivers and streams that are not designated as essential habitat or use non-motorized mining methods such as gold panning. Plaintiff Larry Coon, for example, did not testify that all of his mining claims are located in essential salmon habitat, and he contends only that the legislation will significantly limit his mining operations, not eliminate them. Coon decl. ¶¶ 2, 5. Only half of plaintiff Millennium Diggers' mining claims are located within essential salmon habitat. Darnell decl. ¶ 4. Some of its members, moreover, "utilize non-motorized techniques, such as gold panning." *Id.* ¶ 3. Plaintiff Jason Gill's mining operations occur between 50 and 300 feet from a creek. Gill decl. ¶¶ 3–4. These operations would not be affected by Senate Bill 3, which applies solely to in-stream mining. The deposits associated with plaintiff Joel Grothe's claim fall not only within the creek bottom but also within 100 yards of the creek. Grothe decl. ¶ 7. Only some of plaintiff Willamette Valley Miners' mining claims are located in essential salmon habitat. Hunter decl. ¶ 9. Its members' mining, moreover, includes "non-

Second, Senate Bill 3 does not constitute land use planning simply because it prohibits a particular mining method rather than "prescrib[ing] limits" on environmental damage by adopting a pollution standard. *Granite Rock* does not hold that only standards, not restrictions on activities, are permissible environmental regulation.  On the contrary, *Granite Rock* says only that "environmental regulation, *at its core*, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits."  480 U.S. at 587 (emphasis added).[8]  It does not purport to define the entire universe of environmental regulation as consisting solely of limit-prescribing standards.   That formalistic approach ignores the practical reality that environmental regulation may take several forms, and it would make no sense, given that regulations imposing pollution standards can

---

motorized techniques, such as gold panning."  *Id.* ¶ 8.  Plaintiff Michael Lovett testified that Senate Bill 3 would significantly limit his mining operations, but not that it would eliminate them.  Lovett decl. ¶ 4.  We take seriously the plaintiffs' contentions that Senate Bill 3 will seriously impact their mining operations with respect to at least some of their mining claims.  But the plaintiffs' own declarations make clear that Senate Bill 3 is not a ban on mining.

[8] The dissenting opinion characterizes us as treating this language as "non-binding dicta (Dissent 58 n.2)," but that is not the case.  In addition, the dissent's theory that a distinction between regulations dictating "uses" and regulations dictating "standards" would provide a "clear line between land use planning and environmental regulation" (Dissent 58) eludes us. Would a regulation limiting the size of suction dredge hoses prohibit a "use" (of larger hoses) or prescribe a "standard" (on the size of the hose and, consequently, the volume of material to be dredged)?  Would a regulation limiting the size of the vehicles miners could use to reach their claims prohibit a "use" (of heavy vehicles) or prescribe a "standard" (on the weight of vehicles and the resulting damage to the surface of the forest)?

impact mining operations every bit or even more than regulations restricting particular mining methods.   The plaintiffs concede, for example, that "Oregon's water quality standard for turbidity" constitutes a permissible, non-preempted "environmental regulation" under *Granite Rock*. A stringent turbidity standard, however, might have a greater adverse impact on the plaintiffs' mining operations than Senate Bill 3's targeted restrictions on motorized mining.

Senate Bill 3 also is not part of Oregon's extensive and distinct land use system.   That system requires the development of comprehensive plans by local governments, implemented through zoning, and reviewed by the Oregon Land Conservation and Development Commission.  Those decisions, in turn, are reviewed by a State Land Use Board of Appeals, which has developed significant land use case law. *See generally* Or. Rev. Stat. §§ 197.005–197.860, 215.010–215.990.   Senate Bill 3 stands apart from that regime.

The plaintiffs' argument, moreover, overlooks Senate Bill 3's obvious and important environmental purpose.[9] The Oregon legislature adopted Senate Bill 3's restrictions on motorized mining "[i]n order to protect indigenous anadromous salmonids and habitat essential to the recovery

---

[9] Although the plaintiffs contend Oregon's purpose in adopting Senate Bill 3 is irrelevant to the preemption analysis, our case law is to the contrary.  *See Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1106 n.8 (9th Cir. 2016) (rejecting the proposition "that the state's purpose in passing a statute is not relevant to our preemption analysis, as both this court and the Supreme Court have analyzed purpose in preemption cases").  In *Granite Rock*, moreover, the Supreme Court expressly considered whether the state's "true purpose in enforcing a permit requirement [was] to prohibit [the plaintiff's] mining entirely."  *Granite Rock*, 480 U.S. at 588.

and conservation of Pacific lamprey." 2017 Or. Laws ch. 300, § 4(2). "'Essential indigenous anadromous salmonid habitat' means the habitat that is necessary to prevent the depletion of indigenous anadromous salmonid species during their life history stages of spawning and rearing." Or. Rev. Stat. § 196.810(1)(g)(B). "'Indigenous anadromous salmonid' means chum, sockeye, Chinook and Coho salmon, and steelhead and cutthroat trout, that are members of the family Salmonidae and are listed as sensitive, threatened or endangered by a state or federal authority." *Id.* § 196.810(1)(g)(C).

Similarly, in Senate Bill 838, the legislature found that "[m]ining that uses motorized equipment in the beds and banks of the rivers of Oregon can pose significant risks to Oregon's natural resources, including fish and other wildlife, riparian areas, water quality, the investments of this state in habitat enhancement and areas of cultural significance to Indian tribes." 2013 Or. Laws ch. 783, § 1(4). The legislature found that, "[b]etween 2007 and 2013, mining that uses motorized equipment in the beds and banks of the rivers of Oregon increased significantly, raising concerns about the cumulative environmental impacts." *Id.* § 1(5). It found that "[t]he regulatory system related to mining that uses motorized equipment in the beds and banks of the rivers of Oregon should be efficient and structured to best protect environmental values." *Id.* § 1(6).

The plaintiffs' attempts to cast doubt on Senate Bill 3's environmental purpose are unconvincing. They contend that Senate Bill 3's restrictions were not "required to advance any *bona fide* environmental interest of the State of Oregon" and instead were "primarily motivated by objections from other

users of the waterways." Their evidence, however, fails to substantiate these broad claims.

They rely, first, on two Oregon statutes, but neither one undermines the Oregon legislature's determination that restrictions on motorized mining are necessary to protect fish habitat. The first of these statutes, former Or. Rev. Stat. § 517.123(3), adopted in 1999, simply found that "prospecting, small scale mining and recreational mining . . . [c]an be conducted in a manner that is not harmful and may be beneficial to fish habitat and fish propagation." 1999 Or. Laws ch. 354, § 2(3). There is, of course, no inconsistency between the general finding that small scale mining *can be* conducted in a non-harmful manner and Senate Bill 3's conclusion that it was necessary, "[i]n order to protect indigenous anadromous salmonids and habitat essential to the recovery and conservation of Pacific lamprey," to restrict one particular type of small scale mining – "motorized in-stream placer mining" – in certain environmentally sensitive areas. 2017 Or. Laws ch. 300, § 4(2). In any event, the Oregon legislature repealed the 1999 finding in 2013, noting a "significant[]" increase in motorized mining between 2007 and 2013 that "pose[d] significant risks to Oregon's natural resources, including fish and other wildlife." 2013 Or. Laws ch. 783, §§ 1(4)–(5), 10. The 1999 finding, therefore, does nothing to undermine Senate Bill 3's avowed and self-evident environmental purpose.

The second statute upon which the plaintiffs rely, Or. Rev. Stat. § 517.005, says only that

> Technological advances in the mining industry, coupled with reclamation efforts, have greatly reduced the environmental

> impacts of mining operations. The size and scope of modern operations is such that the operations do not cause interference with other natural resource uses, particularly in an area as vast as eastern Oregon.

Or. Rev. Stat. § 517.005(4). Because this provision pertains to mining generally, and not to the particular environmental concerns addressed by Senate Bill 3, it too does nothing to undermine the validity of Senate Bill 3's stated environmental purpose.

Beyond these two statutes, the plaintiffs' evidence regarding Senate Bill 3's purpose consists solely of a single statement in the record by plaintiff Michael Hunter. Hunter testified that, "[i]n [the Willamette Valley Miners'] experience, the State of Oregon regulates in utter disregard to the National interest in mineral development, instead seeking to placate other user groups who resent, and desire to eliminate the presence of miners on public lands." Hunter decl. ¶ 12. Even granting this statement may reflect Hunter's sincere personal opinion, it is wholly lacking in the specific factual support that would be needed to create a genuine issue of material fact as to Senate Bill 3's purpose. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (as amended) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

In sum, because Senate Bill 3 has a clear environmental purpose, is tailored to that purpose, and does not prohibit mining, choose land uses or fall within Oregon's distinct land use planning system, we hold that it is an environmental regulation rather than a state land use planning law. Thus,

even assuming for purposes of our analysis that federal law preempts the extension of state land use plans on federal lands, Senate Bill 3 is not preempted.

Our dissenting colleague takes the view that *any* state environmental regulation – whether in the form of a "use" restriction or a "standard" – constitutes a "de facto land use regulation preempted by federal law" whenever it renders regulated mining claims commercially impracticable. Dissent 70–71. Where a conflict exists between regulated mining claims and a need to protect the environment, the mining claims must always take precedence.

The dissent assures us that a commercial practicability test would not undermine environmental protection because it would affect only *state* regulation, not *federal* regulation. Dissent 69 ("Even if federal law preempts Oregon's attempt to apply Senate Bill 3 to federal lands, the miners must still comply with all environmental laws and standards imposed expressly by federal statutes and regulations."). But this is not how environmental protection on federal lands is achieved. As *Granite Rock* recognizes, the federal scheme relies on *the states* to provide environmental regulation of mining claims on federal lands. Because federal law "expressly contemplate[s] coincident compliance with state as well as with federal law," *Granite Rock*, 480 U.S. at 584, "reasonable state environmental regulation is not preempted," *id.* at 589. That is why the U.S. Departments of Agriculture and the Interior, which are the federal agencies charged with management and environmental protection of the federal lands impacted by Senate Bill 3, have joined this case on the side of Oregon, urging us to uphold Senate Bill 3 against the plaintiffs' preemption challenge.

Under the dissent's commercial impracticability test, even a patently destructive method of mining would be permitted as long as it represented the only commercially viable means of extracting minerals from the ground, irrespective of the havoc it would wreak on wildlife and habitat. This is the mining "at all costs" approach that the plaintiffs expressly disclaim. Reply Br. 29. We can find no support for that approach in federal mining law or case law. On the contrary, federal mining law, *see, e.g.*, 30 U.S.C. § 21a, the Supreme Court and the United States as amicus curiae all agree that mining must be pursued consistent with environmental needs, not irrespective of environmental cost. That is why "reasonable state environmental regulation is not preempted." *Granite Rock*, 480 U.S. at 589. We respectfully decline the dissent's suggestion to hold that reasonable state environmental regulation is preempted merely because it renders regulated mining claims unprofitable. That approach cannot be reconciled with the balance Congress has sought to achieve.

> 2. *Conflict Preemption: The Plaintiffs' Argument That Senate Bill 3 Is Preempted Because It Is "Prohibitory" Rather Than "Regulatory"*

We next consider the plaintiffs' contention that Senate Bill 3 is conflict preempted because it is "prohibitory" rather than "regulatory" in its fundamental character. There is, of course, some overlap between this argument and the field preemption argument we have just addressed. In both instances, the plaintiffs contend Senate Bill 3 is preempted because it *prohibits* a particular mining method rather than merely subjecting that mining method to an environmental standard. Despite these similarities, however, we treat the two arguments as distinct. The plaintiffs' field preemption

argument is based on *Granite Rock*'s distinction between land use planning on the one hand and environmental regulation on the other. By contrast, their current argument – finding a distinction between "prohibitory" and "regulatory" state environmental regulation and deeming the former conflict preempted – is largely based on *South Dakota Mining Association v. Lawrence County*, 155 F.3d 1005 (8th Cir. 1998).

In *South Dakota Mining*, county voters approved an ordinance that amended the county's zoning laws to prohibit the issuance of new or amended permits for surface metal mining in the 40,000-acre Spearfish Canyon Area, 90 percent of which fell within a national forest. *See id.* at 1006–07. The plaintiffs argued the ordinance was preempted because it stood as an obstacle to the accomplishment of the full purposes and objectives of Congress embodied in the Mining Act of 1872. *See id.* at 1009.

"To determine the purposes and objectives that are embodied in the Mining Act," the Eighth Circuit considered the language of the Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a, and the Mining Act itself, 30 U.S.C. § 22. As noted, § 21a states:

> The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals

and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities.

30 U.S.C. § 21a.  The Mining Act, in turn, states:

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

*Id.* § 22.  In light of these statutes, the Eighth Circuit concluded the Mining Act embodies several congressional purposes, including

the encouragement of exploration for and mining of valuable minerals located on federal lands, providing federal regulation of mining to protect the physical environment while allowing the efficient and economical extraction and use of minerals, and allowing state and local regulation of mining so long as such regulation is consistent with federal mining law.

*South Dakota Mining*, 155 F.3d at 1010.

The Eighth Circuit next considered whether the challenged ordinance stood as an obstacle to these purposes and objectives. At the outset, the court observed that, because surface metal mining was the only practical way to "actually mine the valuable mineral deposits located on federal land in the area," the ordinance was "a de facto ban on mining in the area." *Id.* at 1011. The court then held that, as a de facto ban on mining, the ordinance was preempted:

The ordinance's de facto ban on mining on federal land acts as a clear obstacle to the accomplishment of the Congressional purposes and objectives embodied in the Mining Act. Congress has encouraged exploration and mining of valuable mineral deposits located on federal land and has granted certain rights to those who discover such minerals. Federal law also encourages the economical extraction and use of these minerals. The Lawrence County ordinance completely frustrates the accomplishment of these federally encouraged activities. A local

> government cannot prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages. To do so offends both the Property Clause and the Supremacy Clause of the federal Constitution. *The ordinance is prohibitory, not regulatory, in its fundamental character.* The district court correctly ruled that the ordinance was preempted.

*Id.* (emphasis added).

The plaintiffs discern from *South Dakota Mining*, and from federal statutes governing mining, a general principle that state environmental regulations are preempted, categorically, whenever they are "prohibitory" rather than "regulatory" in their "fundamental character." "Even prohibitions on the use of particular mining methods," they say, "create an obstacle to the full accomplishment of Congressional purposes." We disagree.

Like the United States, "[w]e would agree that were a state to completely prohibit all mining activity on federal lands, federal mining law would preempt the ban." Brief of the United States as Amicus Curiae 21. We cannot agree with the plaintiffs, however, that conflict preemption in this area turns on whether a state environmental regulation could be viewed as "prohibitory" or "regulatory" in its "fundamental character." For one thing, as the government explains, the distinction likely would be unworkable:

> It is unclear how this Court would determine whether [Senate Bill 3] is "prohibitory . . . in its fundamental character." *South Dakota*

*Mining*, 155 F.3d at 1005. Certainly it prohibits some very specific types of mining activity in very specific places . . . , but in the process of identifying where its prohibitions apply it seems "regulatory" in nature. In a sense, [Senate Bill 3] is both regulatory and prohibitory, but whether that makes it preempted is a question to be answered by long-established preemption law. Regardless of whether a state regulatory prohibition is considered "prohibitory" or "regulatory," it is permissible so long as it does not pose an obstacle to Congressional purposes or make compliance with federal law physically impossible.

*Id.* at 22.[10]

We are not persuaded, moreover, that federal statutes governing mining evince a congressional purpose to preempt, categorically, state environmental regulations that are "prohibitory" in their "fundamental character."[11] The Mining Act of 1872, upon which the plaintiffs heavily rely, states

---

[10] We have drawn a distinction between "regulatory" and "prohibitory" laws in other contexts, but those analyses are not helpful here. *E.g.*, *United States v. Dotson*, 615 F.3d 1162, 1168 (9th Cir. 2010) (Assimilative Crimes Act).

[11] This conclusion is a consistent with a leading treatise on mining law. *See* 5 American Law of Mining § 174.04[2][c] (2d ed. 2018) (noting that "state law requirements prohibiting a federally authorized activity on federal land are less likely to be upheld," but "the *Granite Rock* decision indicates that state law requirements that can be harmonized with federal regulations may be enforceable").

only that "all valuable mineral deposits in lands belonging to the United States. . . shall be free and open to exploration and purchase." 30 U.S.C. § 22. The plaintiffs contend that this statute's "free and open" language "create[s] a Congressional mining objective inconsistent with state-law based prohibitions of mining activity." But the Mining Act expressly incorporates state regulation of mining activity, stating that exploration authorized by the statute must occur "under regulations prescribed by law." *Id.*[12] Nothing in the

---

[12] Although the phrase "under regulations prescribed by law" applies to state as well as federal law – a conclusion that follows from § 22's later reference to "laws of the United States," s*ee Corley v. United States*, 556 U.S. 303, 315 (2009) – the plaintiffs suggest it incorporates only state property law, not state environmental law, pointing out that a separate provision of the Mining Act incorporates state law only with respect to possessory title. *See* 30 U.S.C. § 26 (granting rights of possession and enjoyment to locators who "comply with the laws of the United States, and with *State*, territorial, and local *regulations not in conflict with the laws of the United States governing their possessory title*" (emphasis added)). But there is nothing surprising in the fact that § 26, a provision addressing possessory title, refers only to state laws respecting title. This tells us nothing about the scope of the state law incorporated by § 22, which deals with the much broader subject of making federal lands free and open to exploration. Indeed, that § 26 expressly limits the incorporation of state law to laws respecting "possessory title," and § 22 does not, supports the conclusion that the scope of state laws incorporated by § 22 is *not* limited to those respecting title. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))); *see also Rinehart*, 377 P.3d at 824 (explaining that § 22's "express acknowledgement[] of the application of state and local law to federal mining claims suggest[s] an apparent willingness on the part of Congress to let federal and state regulation broadly coexist").

Mining Act suggests a categorical distinction between "prohibitory" and "regulatory" state laws.

We likewise find no support for the plaintiffs' position in the Surface Resources and Multiple Use Act of 1955. This law gives the United States the right to manage surface resources on unpatented mining claims, subject to the important proviso that "any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to *endanger or materially interfere* with prospecting, mining or processing operations or uses reasonably incident thereto." 30 U.S.C. § 612(b) (emphasis added). As with the Mining Act of 1872, nothing in this law suggests Congress intended to draw a distinction between "prohibitory" and "regulatory" measures. We have, moreover, already held that this law *permits* environmental regulations, such as Senate Bill 3, that prohibit the use of particular mining methods. *See United States v. Richardson*, 599 F.2d 290, 291, 295 (9th Cir. 1979) (holding the Forest Service could, without running afoul of § 612(b), require the locators of unpatented mining claims on national forest lands to use nondestructive methods of prospecting, where the

---

The plaintiffs' reliance on 30 U.S.C. § 28 is similarly unpersuasive. That provision requires locators to perform annual work on their unpatented claims to maintain their exclusive rights. *See* 30 U.S.C. § 28. Nothing in Senate Bill 3 precludes miners from performing work on or making improvements to their claims, and to the extent miners elect not to perform work because state environmental regulation makes working or improving their claims unprofitable, that scenario is as likely to arise from a "regulatory" measure as it is from a "prohibitory" one.

locators' utilization of blasting and bulldozing was destructive to the surface resources).[13]

The plaintiffs' argument similarly finds no support in the Mining and Minerals Policy Act of 1970. Under this law:

> The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and *environmental needs*, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources,

---

[13] We also find nothing in the 1955 law to suggest Congress intended to limit state environmental regulation. On its face, § 612(b) imposes limits on only the federal government, not states, and it expressly preserves state water quality controls:

> [N]othing in this subchapter . . . shall be construed as affecting or intended to affect or in any way interfere with or modify the laws of the States which lie wholly or in part westward of the ninety-eighth meridian relating to the ownership, control, appropriation, use, and distribution of ground or surface waters within any unpatented mining claim.

30 U.S.C. § 612(b).

and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to *lessen any adverse impact of mineral extraction and processing upon the physical environment* that may result from mining or mineral activities.

30 U.S.C. § 21a (emphasis added).

The plaintiffs read this statutory language to suggest that Congress intended to meet the nation's environmental needs solely through the process of reclamation, not through regulation of mining itself. This reading, however, lacks any basis in the statutory text or in case law. The plaintiffs alternatively look to the statute's reference to "lessen[ing]" adverse environmental impacts. They contend "[l]essening impact is a regulatory action," distinct from prohibiting mining activities. We again disagree. The statute's reference to lessening impacts relates solely to reclamation. In any event, regulators can lessen impacts through either "prohibitory" or "regulatory" action. *E.g.*, *Richardson*, 599 F.2d at 295.

The plaintiffs' reliance on the Surface Mining Control and Reclamation Act of 1977 is equally flawed. This law allows a state to ask the Secretary of the Interior to declare residential areas unsuitable for mining. *See* 30 U.S.C. § 1281. The plaintiffs contend that "Congress' provision of this and other federal processes for resolving state/federal conflict over mining on federal land is utterly inconsistent with any Congressional intent to allow states to simply prohibit the mining themselves." We agree, of course, that states cannot simply prohibit mining on federal lands. But

nothing in § 1281 suggests Congress intended to preempt environmental regulations prohibiting particular mining methods in specified, environmentally sensitive areas.

The plaintiffs' reliance on federal land management statutes suffers from similar problems. The Supreme Court has examined these statutes and concluded that Congress did not intend by these laws to preempt reasonable state environmental regulation. *See Granite Rock*, 480 U.S. at 582–93. Nothing in these statutes, moreover, suggests a distinction between "prohibitory" and "regulatory" state environmental regulation.

In sum, the plaintiffs' proposed distinction between regulations that are "prohibitory" or "regulatory" in their "fundamental character" is neither workable nor grounded in the federal statutes upon which the plaintiffs rely. We find in these statutes no indication that Congress intended to preempt state environmental regulation merely because it might be viewed as "prohibitory." We therefore reject the plaintiffs' contention that Senate Bill 3 stands as an obstacle to the accomplishment of the full purposes and objectives of Congress merely because it "prohibits" a particular method of mining in the portions of rivers and streams containing essential habitat for threatened and endangered salmonids.[14]

---

[14] This conclusion is consistent with the California Supreme Court's recent decision in *Rinehart*, 377 P.3d 818, *cert. denied sub nom. Rinehart v. California*, 138 S. Ct. 635 (2018). In rejecting a conflict preemption challenge to a California law prohibiting suction dredge mining in order to protect endangered coho salmon habitats, *Rinehart* concluded that "[t]he federal statutory scheme does not prevent states from restricting the use of particular mining techniques based on their assessment of the collateral consequences for other resources." *Id.* at 829.

This conclusion does not place us at odds with *South Dakota Mining*. Although the Eighth Circuit drew a distinction between "prohibitory" and "regulatory" measures, it did so in the context of a county ordinance amounting to a "de facto ban on mining" that applied broadly and indiscriminately to federal lands within the county. 155 F.3d at 1011. The ordinance at issue effectively prohibited mining, covered 40,000 acres, targeted federal lands (90 percent of the land affected by the ban was in a national forest), lacked any environmental purpose and was part of the county's zoning law. Senate Bill 3, by contrast, is not part of Oregon's zoning law, is not a de facto ban on mining, has an express environmental purpose, does not single out federal land and carefully targets only designated essential salmonid habitat. Whereas the ordinance in *South Dakota Mining* was an attempt by county voters to overrule federal land use decisions, Senate Bill 3 complements those decisions by playing the traditional role served by state environmental regulation. *See, e.g.*, 36 C.F.R. § 228.8(a)–(c); 43 C.F.R. §§ 3809.3, 3809.420(b)(4)–(6). Were Senate Bill 3 an encroachment on federal land use decisions, we would expect the United States to say so. The United States, however, takes the position that Senate Bill 3 "is not preempted by federal law." Brief of the United States as Amicus Curiae 28.[15]

The plaintiffs' reliance on *Skaw v. United States*, 740 F.2d 932 (Fed. Cir. 1984), *Ventura County v. Gulf Oil Corp.*, 601 F.2d 1080 (9th Cir. 1979), *Brubaker v. Board of County*

---

[15] The United States' amicus brief is filed on behalf of the U.S. Department of the Interior, the U.S. Department of Agriculture and the U.S. Department of Justice's Environment and Natural Resources Division.

*Commissioners, El Paso County*, 652 P.2d 1050 (Colo. 1982), *State ex rel. Andrus v. Click*, 554 P.2d 969 (Idaho 1976), and *Elliott v. Oregon International Mining Co.*, 654 P.2d 663 (Or. Ct. App. 1982), does not require a different conclusion. Each case predates the Supreme Court's holding in *Granite Rock* that reasonable state environmental regulation is not preempted by federal law. *See Granite Rock*, 480 U.S. at 589; *Rinehart*, 377 P.3d at 829. Similar to *South Dakota Mining*, moreover, most of these cases involved improper attempts by local governments to displace, rather than supplement, federal land use decisions. *See Ventura County*, 601 F.2d at 1084–85 (precluding the county from applying "land use planning controls" "in an attempt to substitute its judgment for that of Congress"); *Brubaker*, 652 P.2d at 1059 ("This is not denial of a permit because of failure to comply with reasonable regulations supplementing the federal mining laws, but reflects simply a policy judgment as to the appropriate use of the land."); *Elliott*, 654 P.2d at 665, 668 (barring the application of county zoning laws prohibiting mining because they did "not simply supplement federal mining law"). In addition, *Ventura County* involved the Mineral Lands Leasing Act of 1920, not the laws at issue here, and, in contrast to the case before us, the drilling operations at issue in *Ventura County* were subject to "detailed [federal] supervision" and an "extensive federal scheme reflecting concern for the local environment." 601 F.2d at 1084.

>   3.  *Conflict Preemption: The Plaintiffs' Argument That Senate Bill 3 Does Not Constitute Reasonable Environmental Regulation*

We have consistently held that Congress intended to permit reasonable environmental regulation of mining claims

on federal lands. In *United States v. Weiss*, 642 F.2d 296 (9th Cir. 1981), for example, after considering the purposes underlying the Mining Act of 1872 and the Organic Act of 1897, including 16 U.S.C. §§ 475, 478 and 551, we concluded:

> The Secretary of Agriculture has been given the responsibility and the power to maintain and protect our national forests and the lands therein. While prospecting, locating, and developing of mineral resources in the national forests may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition, the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes.

642 F.2d at 299. In *United States v. Shumway*, 199 F.3d 1093 (9th Cir. 1999), where we considered not only the Mining Act and the Organic Act but also the "endanger or materially interfere" standard embodied in 30 U.S.C. § 612(b), we once again held that "the Forest Service may regulate use of National Forest lands by holders of unpatented mining claims . . . to the extent that the regulations are 'reasonable' and do not impermissibly encroach on legitimate uses incident to mining and mill site claims." 199 F.3d at 1107.

Congress, moreover, clearly intended reasonable *state* environmental regulation to govern mining on federal lands. In *Granite Rock*, the Supreme Court held that "reasonable state environmental regulation is not pre-empted." 480 U.S. at 589; *see also id.* at 593. The plaintiffs do not dispute that

a reasonableness standard applies here, but they argue that Senate Bill 3 is preempted because it constitutes an *unreasonable* environmental regulation.

The plaintiffs' arguments regarding unreasonableness echo those we have already considered. They contend Senate Bill 3 is an unreasonable regulation because it *prohibits* a particular method of mining in designated habitat, rather than subjecting that mining to a "prescribed limit" or pollution standard, and because it allegedly was "enacted for reasons expressly beyond protection of the environment." We have already addressed these arguments. The preemption analysis does not turn on a formalistic distinction between "prohibitory" and "regulatory" measures, and the plaintiffs' evidence does not create a genuine dispute as to Senate Bill 3's important environmental purpose. We recognize that unreasonable, excessive or pretextual state environmental regulation that unnecessarily interferes with development of mineral resources on federal land may stand as an obstacle to the accomplishment of the full purposes and objectives of Congress. We agree with the United States, however, that in this case that line has not been crossed. As the government explains, "[a] state law such as [Senate Bill 3] that is clearly intended to protect the natural environment by prohibiting the use of particular mining methods or equipment in carefully[] designated locations is not so at odds with Congress's purposes that it is preempted by federal law." Brief of the United States as Amicus Curiae 2–3.

### 4. The Plaintiffs' Argument That Genuine Issues of Material Fact Preclude Summary Judgment

The plaintiffs argue that genuine issues of material fact preclude summary judgment in favor of the state. For

purposes of our de novo review of the summary judgment record, however, we have viewed the evidence in the light most favorable to the plaintiffs, and we have assumed – solely for purposes of determining whether Oregon is entitled to judgment as a matter of law – that Senate Bill 3 will have a significant adverse impact on the mining operations of the plaintiffs, making it effectively impossible for at least some of them to recover the valuable mineral deposits present on their claims.  The only material dispute is whether, assuming these facts, Senate Bill 3 is preempted.  Because that issue is one of law, summary judgment is appropriate.  *See Inland Empire Chapter of Associated Gen. Contractors of Am. v. Dear*, 77 F.3d 296, 299 (9th Cir. 1996) (holding a "finding of no preemption is a legal question").[16]

### CONCLUSION

The district court properly rejected the plaintiffs' preemption claims.  We hold that Senate Bill 3 is not preempted by federal law.  The judgment of the district court is therefore affirmed.

**AFFIRMED.**

---

[16] Contrary to the dissent, we do not today question the validity of as-applied preemption challenges.  Dissent 66 & n.7.

N.R. SMITH, Circuit Judge, dissenting:

The National Forest Management Act of 1976 (NFMA), Pub. L. No. 94-588, 90 Stat. 2949 (1976), and the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, 90 Stat. 2743 (1976), occupy the field of land use planning regulation on federal lands. Because the permanent ban on motorized mining in Oregon Senate Bill 3 does not identify an environmental standard to be achieved but instead restricts a particular use of federal land, it must be deemed a land use regulation preempted by federal law. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 586–88 (1987). Therefore, I must dissent.

## I.

Although technically an open question, there is little dispute that Congress has occupied the field of land use planning on federal lands through its enactment of NFMA and FLPMA.[1] *See id.* at 585 ("For purposes of this discussion and without deciding this issue, we may assume that the combination of the NFMA and the FLPMA pre-empts the extension of state land use plans onto unpatented mining claims in national forest lands."); *id.* at 612–13 (Scalia, J., dissenting) ("The Court is willing to assume that California lacks such authority on account of [NFMA] and [FLPMA]. I believe that assumption is correct.").

Field preemption arises when "federal law so thoroughly occupies a legislative field as to make reasonable the

---

[1] The majority (like the court in *Granite Rock*) assumes this point without deciding it. I address the merits of the issue because it is necessary to my determination that federal law preempts Senate Bill 3.

inference that Congress left no room for the States to supplement it." *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016) (internal quotation marks omitted) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). "The essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." *Id.* at 734. To make this determination, our cases require first "delineat[ing] the pertinent regulatory field." *Id.* We have "emphasized the importance of delineating the pertinent area of regulation with specificity before proceeding with the field preemption inquiry." *Id.* Here the pertinent field involves any land use regulation of federal lands.

The next step in our analysis requires us to "survey the scope of the federal regulation within th[is] field." *Id.* Here, the relevant statutes are NFMA and FLPMA. Taken together, these statutes establish a comprehensive regulatory regime for land use planning on federal lands, including the role of states in the planning process. First, NFMA vests the authority to enact federal land use plans with respect to forest service lands in the Secretary of Agriculture, and FLPMA vests the authority to enact federal land use plans with respect to all other federal land in the Secretary of the Interior. 16 U.S.C. § 1604(a) ("[T]he Secretary [of Agriculture] shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System . . . ."); 43 U.S.C. § 1712(a) ("The Secretary [of the Interior] shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such

lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.").

Second, NFMA and FLPMA expressly designate the level of state participation contemplated by federal law. *See* 16 U.S.C. § 1604(a); 43 U.S.C. § 1712(c)(9). NFMA requires "coordin[ation] with the land and resource management planning processes of State and local governments and other Federal agencies." 16 U.S.C. § 1604(a). FLPMA requires similar coordination with states, but the requirement is limited "to the extent consistent with the laws governing the administration of public lands." 43 U.S.C. § 1712(c)(9). Moreover, FLPMA directs that the Secretary of the Interior

> shall, *to the extent he finds practical*, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, *to the extent practical*, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands.

*Id.* (emphasis added). As Justice Scalia noted in *Granite Rock*, agreeing (in his dissent) with the majority's assumption of preemption, these "requirements would be superfluous,

and the limitation upon federal accommodation meaningless, if the States were meant to have independent land use authority over federal lands." 480 U.S. at 613 (Scalia, J., dissenting).

Thus, the combination of NFMA and FLPMA occupy the field of land use regulation on federal lands. Accordingly, federal law preempts the extension of any state land use planning regulation or ordinance onto federal lands. *Arizona v. United States*, 567 U.S. 387, 401 (2012) ("Where Congress occupies an entire field . . . even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.").

## II.

Assuming that NFMA and FLPMA occupied the field of federal land use regulation, *Granite Rock* identified the legal framework for determining whether state environmental regulation impermissibly enters the congressionally occupied field of federal land use planning. First, the Court identified the dividing line between environmental regulation and land use planning. "Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits." *Granite Rock*, 480 U.S. at 587. The Court also made clear that the inquiry requires examination not simply of the text of the law, but of its practical effect. "The line between environmental regulation and land use planning will not always be bright; for example, one may hypothesize a state environmental

regulation so severe that a particular land use would become commercially impracticable." *Id.*

The plaintiff miners and mining organizations (collectively "the miners") challenge Senate Bill 3 on both grounds. They assert that Senate Bill 3 impermissibly (A) identifies a particular use of the land that is prohibited without reference to an identifiable environmental standard and (B) renders mining within the identified zones impracticable. Both arguments have merit.

## A.

*Granite Rock* instructs that "environmental regulation, at its core, . . . requires only that, *however the land is used*, damage to the environment is *kept within prescribed limits*." *Id.* (emphasis added) By contrast land use regulation identifies or restricts "particular uses" of land. *Id.*

A brief review of the text of Senate Bill 3 reveals its true character as a land use regulation. The operative language reads "motorized in-stream placer mining may not be permitted to occur up to the line of ordinary high water in any river in this state containing essential indigenous anadromous salmonid habitat, from the lowest extent of essential indigenous anadromous salmonid habitat to the highest extent of essential indigenous anadromous salmonid habitat." 2017 Or. Laws ch. 300, § 4(2). The operative language identifies particular tracts of land and prohibits a particular use of these lands. The operative language does not identify a "prescribed limit[]" on "damage to the environment" that must be avoided "however the land is used." *Granite Rock*, 480 U.S. at 587. Accordingly, federal law preempts Senate

Bill 3 as an improper attempt to extend a state land use regulation onto federal land.

The majority disagrees for four reasons: (1) Senate Bill 3 permits non-motorized mining, (2) it is not located in the land use section of the Oregon state code, (3) it has an environmental purpose, and (4) it is reasonably tailored to accomplish the environmental purpose without unduly interfering with mining operations. The majority's arguments lack merit for the reasons set forth below.

1.

The majority first asserts (without any citation or authority) that, because Senate Bill 3 restricts only one type of mining, it is not a land use planning regulation. The majority's analysis not only conflicts with Supreme Court precedent in *Granite Rock*, but it also erases any clear line between land use planning and environmental regulation.

The majority criticizes the *Granite Rock* principle that environmental regulation "at its core" "prescribe[s] limits" on "damage to the environment" ("however the land is used"). *Granite Rock*, 480 U.S. at 587.**[2]** To the majority, this

---

**[2]** The majority goes so far as to assert that the *Granite Rock* standard is somehow non-binding dicta. *See* Maj. at 31 ("*Granite Rock* does not hold that only standards, not restrictions on activities, are permissible environmental regulation."). *Granite Rock* fully analyzed the distinction between environmental regulation and land use planning, and the framework it announced was necessary to its holding. 480 U.S. at 585–89. Because the court assumed that land use planning regulation was preempted, it was necessary to decide whether California's permitting system was a land use planning regulation or an environmental regulation. *Id.* at 586. The Court applied the *Granite Rock* framework and determined

distinction is "formalistic" and "make[s] no sense." Maj. at 31. Yet, a line must be drawn, because "Congress has indicated its understanding of land use planning and environmental regulation as distinct activities." *Granite Rock*, 480 U.S. at 587.

Far from being nonsense, the formalism of the *Granite Rock* line makes it clear and easy to apply in deciding facial challenges to state environmental laws.[3] Moreover, the majority offers no alternative standard for drawing a line between environmental regulation (not ordinarily preempted) and land use regulation (always preempted). Without a standard, the majority has no basis to reject the miners' challenge.

---

that California's permit system was a means of identifying environmental standards to be applied to the mining operation, not an attempt to regulate particular uses of the land at issue. *See id.* at 586 ("While the [California law] gives land use as well as environmental regulatory authority to the Coastal Commission, *the state statute also gives the Coastal Commission the ability to limit the requirements it will place on the permit*. . . . Since the state statute does not detail exactly what *state standards* will and will not apply in connection with various federal activities, the statute must be understood to allow the Coastal Commission *to limit the regulations* it will impose in those circumstances." (emphasis added)). This is plainly sufficient to bind our decision here. *Cf. Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." (citation omitted)).

[3] The suction hose size and vehicle weight hypotheticals raised by the majority are not difficult cases under the clear line drawn in *Granite Rock*. Neither regulation identifies an *environmental* standard to be achieved.

Specifically, the majority's suggestion that the law is permissible because it regulates only one means of mining begs the question of the appropriate level of generality at which a law must prohibit a particular use to be deemed a land use planning regulation. Does land use planning involve only broad categories of uses, for example commercial versus noncommercial uses? Or can land use planning also include dividing tracts for commercial fishing from those for commercial mining? Would a law prohibiting the use of any mining tools (motorized or not) within identified zones amount to environmental regulation or land use planning? What if the law also required miners to tie one hand behind their backs? The majority's bare assertion that prohibiting a type of mining does not amount to regulating "particular uses for the land" fails to articulate a meaningful standard and flies in the face of framework set forth in *Granite Rock*. 480 U.S. at 587.[4]

The premise of the majority's insistence that the *Granite Rock* line is nonsense also lacks merit. *See* Maj. at 31. In

---

[4] The majority notes that many of the miners are still able to mine other portions of their claims or are still permitted to mine by hand in the zones covered by the law. I know of no authority for the proposition that a law ceases to be a land use plan simply because it governs only a subset of land, and not all land. Indeed, most land use plans divide land into different zones prescribing a different set of permissible uses for each zone. Accordingly, the fact that some miners have in-stream as well as out-of-stream operations (or operations inside and outside of essential salmonid habitat) matters not at all in our determination of whether Senate Bill 3 is a land use regulation. Likewise, the fact that the law permits mining by hand does not mean its prohibition on motorized mining is not a land use ordinance. Land use plans regulate particular uses all the time. For example, a land use plan might specify that within a residential neighborhood in-home businesses are permitted, but office buildings are not.

addition to being clear, the line drawn in *Granite Rock* serves important functions. For example, standards identify an environmental end to be achieved and offer a means of measuring the degree to which a particular use conflicts with an environmental objective. They are also facially neutral towards varying uses of the land. The majority is right that environmental regulations certainly *can* impact mining practicability. But the Supreme Court made clear that this impact matters only in the exceptional circumstance where an environmental standard is "so severe" as to render any mining within an identified zone "commercially impracticable." *See Granite Rock*, 480 U.S. at 587. The possibility of a narrow exception, does not eliminate the value of the general rule. I address this narrow exception in greater detail in Part II.B.

The Supreme Court meaningfully considered the difficult issue of how to discern land use regulations from environmental ones. The majority errs in failing to follow its instruction. Applying the *Granite Rock* framework here, Senate Bill 3 is a land use regulation that is preempted as applied to federal lands.

2.

The majority next asserts that Senate Bill 3 is not a land use regulation, because it is codified outside the sections of the Oregon Code governing land use planning. However, I know of no canon of construction (and the majority cites none) that suggests that a law's placement within the code can override the substantive import of its text. Further, there are other Oregon land use statutes outside the code sections the majority identifies. *See, e.g.*, Or. Rev. Stat. § 390.250 (authorizing land use planning "to promote the public scenic, park and recreational use of lands along Bear Creek"); Or.

Rev. Stat.§ 390.308 (authorizing land use planning to complete the "Oregon Coast Trail"); Or. Rev. Stat. § 390.112 ("The State Parks and Recreation Department shall propose to the State Parks and Recreation Commission additional criteria for the acquisition and development of new historic sites, parks and recreation areas.").

3.

The majority next asserts that Senate Bill 3 is an environmental regulation because of its "obvious and important environmental purpose." Maj. at 32. To be sure, the prefatory language in Senate Bill 3 identifies an environmental purpose "to protect indigenous anadromous salmonids and habitat essential to the recovery and conservation of Pacific lamprey." 2017 Or. Laws ch. 300, § 4(2).[5] But many land use plans have environmental

---

[5] The majority also cites legislative findings that "[m]ining that uses motorized equipment in the beds and banks of the rivers of Oregon can pose significant risks to Oregon's natural resources, including fish and other wildlife, riparian areas, water quality, the investments of this state in habitat enhancement and areas of cultural significance to Indian tribes." 2013 Or. Laws ch. 783, § 1(4). Maj. at 33. Yet there is little substance to this finding. The legislature identified only the possibility of environmental harm because it used the language "*can* pose significant risks." *Id.* (emphasis added). Almost anything "can pose significant risks" to the environment. Nothing in these findings suggests that any form of motorized mining *necessarily* causes an adverse effect on wildlife resources. Like the prefatory language in Senate Bill 3, this language does not purport to identify an environmental standard to be achieved. The same is true for the majority's other citations to Oregon law. *See* Maj. at 32.

purposes as well.[6] Systems of national parks, state parks, and designated wilderness areas are prime examples of land use planning aimed at accomplishing obvious and important environmental purposes.

Here, the means of accomplishing the environmental purpose undisputedly prohibit a particular use of the land, without reference to an environmental standard to be achieved. Unlike the permit system in *Granite Rock*, this law does not involve a flexible regime that "must be understood to allow [Oregon] to limit the regulations it will impose" in a manner consistent with allowing permissible federal mining to continue. *See Granite Rock*, 480 U.S. at 586.

In contrast to Senate Bill 3, the federal regulations governing mining on public lands cited by the majority are good examples of standards based environmental regulation. Maj. at 22. Each identifies environmental standards to be achieved, rather than particular uses to be prohibited. *See, e.g.*, 36 C.F.R. § 228.8 (identifying federal and state air, water, and solid waste standards that must be complied with and requiring operators to "take all *practicable* measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations" (emphasis added)); 43 C.F.R. § 3809.3 (requiring operators to follow "a higher *standard*" under state law if one has been enacted (emphasis added)); 43 C.F.R. § 3809.420(b) (identifying federal and state air, water, and solid waste standards that must be complied with

---

[6] As the majority notes, purpose is certainly relevant to our preemption analysis. *See* Maj. at 32 n.9. But nothing in our cases suggests that a genuine purpose can innoculate a law that substantively intrudes on a field preempted by Congress. The majority's emphasis on purpose proves too little.

and requiring operators to "take such action *as may be needed to prevent adverse impacts* to threatened or endangered species, and their habitat which may be affected by operations" (emphasis added)).

Simply, the environmental purpose behind Senate Bill 3 does not identify an environmental standard. Indeed, nothing in the law's text (or the record in this case) indicates that motorized mining—in any form or at any scale—necessarily causes harm to indigenous anadromous salmonids or Pacific lamprey. On its face, Senate Bill 3 would prohibit a motorized mining operation irrespective of the miner's compliance with all state and federal environmental standards, including the federal Endangered Species Act, National Environmental Policy Act, and Clean Water Act. This remains true, even if federal (or state) environmental review determines that the net effect of a motorized-mining operation is positive for anadromous salmonids and Pacific lamprey. Senate Bill 3 simply mandates that—irrespective of the *actual* environmental impact—motorized mining is a prohibited use of land in the identified zones. Congress has preempted this type of intrusion into the field of federal land use planning.

4.

Lastly, the majority persistently makes the bare assertion that federal law does not preempt Senate Bill 3, because it is "tailored to" its environmental purpose. *See* Maj. at 27 (asserting (without elaboration) that the law is "tailored to achieve its environmental purpose without unduly interfering with mining operations"); Maj. at 35 (concluding that Senate Bill 3 "is tailored" to its environmental purpose). The majority cites no legal authority (and I am aware of none) for

the proposition that federal preemption analysis includes an assessment of the fit between the substance of a state law and its stated purpose.

Further, the majority fails to explain how it reaches its reasonably tailored conclusion. As to the merits of the majority's conclusion that the law is reasonably tailored, I have my doubts. First, the parties have not argued the issue one way or the other.

Second, the tailoring issue necessarily turns on facts that are disputed or not in evidence, including the extent to which motorized mining negatively impacts fish habitat and whether there are some means of motorized mining that would not adversely impact fish habitat. A tailoring analysis would involve actually assessing the degree to which a law advances its stated purpose (i.e. the state's interest). *Cf., e.g.*, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1178 (9th Cir. 2018) (discussing narrow tailoring as an analysis focused on the degree of fit between ends and means). Yet, the majority appears to use the laws' stated purpose as the premise for its reasonable tailoring conclusion. Good intentions are never enough to establish that a law is properly tailored. *Cf. id.* (striking down a commercial speech restriction because there were alternatives that "would restrict less speech and would more directly advance California's asserted interest in preventing consumer deception").

It remains unclear to me how a tailoring analysis aids us in deciding the preemption question. But to the extent the inquiry is relevant, the obvious and less restrictive regulation here would be to simply require that mining activity in essential habitat areas be conducted in a manner that does not adversely affect fish habitat—thus prohibiting non-motorized

mining adverse to fish populations and permitting motorized mining that can be conducted consistent with requirement to preserve essential habitat.

## B.

Federal law not only preempts Senate Bill 3 on its face, but the miners also identified disputed issues of material fact precluding summary judgment on their *Granite Rock* as-applied preemption challenge. Contrary to the majority's suggestion, Maj. at 50, the law recognizes as-applied preemption challenges that turn on the effect in operation of the allegedly preempted state law. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992) ("Although 'part of the pre-empted field is defined by reference to the purpose of the state law in question, . . . another part of the field is defined by the state law's actual effect.'" (alterations in original) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990))); *id.* ("In assessing the impact of a state law on the federal scheme, we have refused to rely solely on the legislature's professed purpose and have looked as well to the effects of the law.").[7]

---

[7] Many other cases recognize as-applied preemption challenges. *See, e.g.*, *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943–45 (2016) (identifying factual issues like the "'acute, albeit indirect, economic effects' of [a] state law" as one mechanism for showing a state law is preempted by ERISA (citation omitted)); *Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 540 (6th Cir. 2008) (identifying circumstances for proving a law is "preempted *as applied*" and "requir[ing] a factual assessment" (emphasis in original, internal quotation marks and citations omitted)); *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008) (same). *Compare Puente Arizona v. Arpaio*, 821 F.3d 1098, 1110 (9th Cir. 2016) (remanding a case for consideration of the as-applied preemption challenge), *with Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at

*Granite Rock* expressly recognized this possibility in the context of state environmental regulation versus land use planning. 480 U.S. at 587. As the court noted, "[t]he line between environmental regulation and land use planning will not always be bright; for example, one may hypothesize a state environmental regulation so severe that a particular land use would become commercially impracticable." *Id.* The Court went on to endorse "*reasonable* state environmental regulation" as not preempted by federal law. *Id.* at 589. Whether dicta or holding, these statements by the Supreme Court reach the correct conclusion. Because Congress has occupied the field of land use planning, federal law preempts any environmental regulation that (when applied to federal land) has the effect of prohibiting (for all practical purposes) a particular land use in the regulated zone. To hold otherwise would allow an end-run around federal preemption.

Here, the miners contend that mining without motors is (if not impossible) entirely impracticable within the in-stream zones governed by Senate Bill 3. Thus, they argue the law has the effect of prohibiting mining within the regulated area. At oral argument, the State essentially conceded this fact. United States Court of Appeals for the Ninth Circuit, *16-35262 Joshua Bohmker v. State of Oregon*, YouTube (Mar. 8, 2018), https://youtu.be/IrC_pz9CNh4, at 21:09 to 21:15, 24:00 to 25:00 (acknowledging that Senate Bill 3 effectively prohibits mining in the in-stream areas governed by the law). Thus, the miners argue that entry of summary judgment is inappropriate.

---

*7–13 (D. Ariz. Nov. 22, 2016) (conducting an as-applied preemption analysis and concluding that the law was field preempted as applied to a narrow set of prohibited conduct).

The majority suggests that the miners waived this challenge because they "do not argue that Senate Bill 3 is preempted simply because it may render some of their mining claims commercially impracticable." Maj. at 27–28. Come on. That cannot be the basis for our decision. The record amply establishes that the miners have consistently raised both a facial and as-applied challenge to Senate Bill 3 before the district court and on appeal. Excerpts of R. at 102, 106-07, 118, 121, 124, 130, 135, 143, 150 (identifying declaration testimony by the miners regarding the impact of the law on practicability of mining in the zones governed by Senate Bill 3 that was provided to the district court in opposition to summary judgment); Excerpts of R. at 21–23 (identifying the district court's rejection of the miners' *Granite Rock* commercial impracticability standard); Appellants' Opening Br. at 45–48 (identifying *Granite Rock* commercial impracticability standard and asserting the Oregon law is not a reasonable environmental regulation); Appellants' Opening Br. at 52–57 (identifying the record evidence establishing disputed issues of material fact regarding the impact of the Oregon law on the practicability of mining in the regulated zones); United States Court of Appeals for the Ninth Circuit, *16-35262 Joshua Bohmker v. State of Oregon*, YouTube (Mar. 8, 2018), https://youtu.be/IrC_pz9CNh4, at 8:30 to 17:30 (identifying the argument by the miners' counsel that the practicability of mining is an alternative basis for the court to conclude under *Granite Rock* that federal law preempts Senate Bill 3).[8]

---

[8] The majority doubles down on its erroneous conclusion that the miners have waived an as-applied challenge to Senate Bill 3. In support of its conclusion, the majority cites a single line in the miners' reply stating that "[t]his appeal is not about profitability, but about prohibition." Maj. at 28 n.6 (citing Reply Br. at 41). Nothing in the quoted language

The majority next rejects the merits of an as-applied theory of preemption, asserting that considerations of commercial practicability would endanger every environmental regulation. Not so.

We are presented with a narrow but important issue of preemption. Even if federal law preempts Oregon's attempt to apply Senate Bill 3 to federal lands, the miners must still comply with all environmental laws and standards imposed expressly by federal statutes and regulations. The *Granite Rock* practicability exception does not apply to federal regulation. *Cf., e.g.*, *Clouser v. Espy*, 42 F.3d 1522, 1530 (9th Cir. 1994) (affirming forest service access regulation that diminished value of mining claims). Moreover, Oregon remains free to coordinate its land use plans with the relevant federal agencies in seeking an outright federal prohibition on mining within essential habitat on federal lands. Oregon may also amend its statute to incorporate an environmental standard to require mining activity in essential habitat be conducted in a manner that avoids damage to fish habitat. In short, a win for the miners is not likely to lead to environmental disaster as the majority portends.

Second, commercial practicability is a judicially manageable standard. "[V]irtually every environmental regulation" is not at risk. *See* Maj. at 28–29. Contrary to the

---

forecloses the argument that Senate Bill 3 *effectively* functions as a prohibition in the regulated zones. Waiver requires an "intentional relinquishment of a known right." *E.g.*, *Oelbermann v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5, 5 (9th Cir. 1925) (citation omitted). The miners have consistently argued that Senate Bill 3 makes it effectively impossible to remove minerals from their claims. In concluding that the issue is waived, the majority simply ignores the substantial briefing and argument cited above.

majority's assertion, nothing in *Granite Rock* suggests a case-by-case, miner-by-miner assessment of commercial practicability. Rather, *Granite Rock* suggests an approach focused on the overall effect of the state regulation on mining practicability. *See Granite Rock*, 480 U.S. at 586–89.

The exception applies only where the regulation's effect is "so severe" that it renders mining on the regulated lands "commercially impracticable" as a general matter. The finances or circumstances of individual miners are not relevant to the analysis. A court simply examines the effect of the regulation on the scope of commercial mining operations that could permissibly be employed in the absence of the regulation. Where a state environmental regulation eliminates all previously permissible means of commercial mining on federal land, it runs afoul of the *Granite Rock* exception. If viable means of commercial mining remain available in most (if not all) tracts of land governed by the regulation, it falls within the general rule that "reasonable state environmental regulation is not pre-empted . . . ." *Id.* at 589.

Here, the miners identified sufficient factual support for the proposition that Senate Bill 3 renders mining commercially impracticable within the areas regulated by the statute. I cannot agree with the majority's assertion that Senate Bill 3 is not a de facto ban on mining because it allows non-motorized mining (i.e. panning for gold by hand). This would be similar to saying to a man that he is not prohibited from building a house on his property, he is only prohibited from using any power tools, trucks, or other motorized equipment in doing so. In an imaginary world, it is certainly still possible that over the course of his life he could dig the foundation, mix the concrete, haul the lumber, and construct

a house eventually. Nonetheless, such a law would render the man's right to build a house a nullity. If the miners proved impracticability on remand, I would conclude that the Oregon law is a de facto land use regulation preempted by federal law.

### III.

In short, there are two alternative grounds to reverse the district court. First, the miners are entitled to summary judgment because federal law preempts Oregon's impermissible attempt to regulate particular uses of federal land under Senate Bill 3. Alternatively, I would recognize the as-applied theory for establishing preemption outlined in *Granite Rock*. Federal law preempts environmental regulation that is so severe that it operates as a de facto land use plan by rendering a particular use of the regulated land utterly impracticable. The miners put on sufficient evidence to establish at least a genuine issue for trial on this theory. Accordingly, I respectfully dissent from the majority's decision to affirm summary judgment in favor of the State of Oregon.